**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **Criminal No. 04cr355-03 (CKK)** |
| CARLOS AGUIAR, | **(Civil Action No. 12-1553)** |
| Defendant. | |

**MEMORANDUM OPINION**
(February 12, 2015)

On July 15, 2005, Carlos Aguiar ("Aguiar") was convicted by a jury in this Court of: conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity ("Count I"), including the armed robbery of the Bank of America located at 5911 Blair Road, N.W., Washington, D.C., on or about January 22, 2004 ("Racketeering Act 1"), the armed robbery of the Industrial Bank located at 2012 Rhode Island Avenue, N.E., Washington, D.C., on or about June 12, 2004 ("Racketeering Act 3"), the armed robbery of the Chevy Chase Bank located at 3601 St. Barnabas Road, Silver Spring, Maryland, on or about May 10, 2004 ("Racketeering Act 5"), and the armed robbery of the Chevy Chase Bank located at 5823 Eastern Avenue, Chillum, Maryland, on or about May 27, 2004 ("Racketeering Act 6"); conspiracy to commit offenses against the United States, that is, armed robberies of banks the deposits of which were then insured by the Federal Deposit Insurance Corporation ("Count II"); armed robbery of the Bank of America on or about January 22, 2004 ("Count III"); using and carrying a firearm during and in relation to a crime of violence on or about January 22, 2004 ("Count IV"); unlawful possession on or about January 22, 2004, of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one

year ("Count V"); armed robbery of the Industrial Bank on or about June 12, 2004 ("Count X");

using and carrying a firearm during and in relation to a crime of violence on or about June 12,

2004 ("Count XI"); unlawful possession of a firearm on or about June 12, 2004, by a person

convicted of a crime punishable by imprisonment for a term exceeding one year ("Count XIII");

and unlawful possession of a firearm on or about August 4, 2004, by a person convicted of a

crime punishable by imprisonment for a term exceeding one year ("Count XX").   Presently

before the Court is Aguiar's *pro se* [779] Motion to Vacate, Set Aside, or Correct Sentence

pursuant to 28 U.S.C. § 2255, and [780] Motion for Leave to Exceed Page Limitation in Filing

his Petition Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence.   Upon a

searching review of the parties' submissions,[1] the relevant authorities, and the record as a whole,

the Court finds no grounds for setting aside Aguiar's conviction and sentence.   Accordingly, the

Court shall DENY Aguiar's [779] Motion to Vacate, Set Aside, or Correct Sentence pursuant to

28 U.S.C. § 2255.   Further, the Court shall DENY AS MOOT Aguiar's [780] Motion for Leave

to Exceed Page Limitation in Filing his Petition Pursuant to 28 U.S.C. § 2255 to Vacate, Set

Aside or Correct Sentence.

## I. BACKGROUND

On August 3, 2004, a federal grand jury indicted Aguiar and six codefendants in

connection with a string of bank robberies that occurred in the District of Columbia and

---

[1] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents: Def.'s Mot. to Vacate Sentence ("Def.'s Mot."), ECF No. [779]; Def's Memo. in Support of Def.'s Mot., ECF No. [779-4] & [808-1]; Govt.'s Opp'n to Def.'s Mot. to Vacate Sentence ("Govt.'s Opp'n"), ECF No. [804]; Def.'s Response to Govt.'s Opp'n to Mot. ("Def.'s Response"), ECF No. [817]; Govt.'s Resp. to Order of the Court, ECF No. [852]; and transcripts of status hearings and trial.

Maryland.[2]  Indictment (Aug. 3, 2004), ECF No. [10].  The United States Court of Appeals for

the District of Columbia Circuit ("D.C. Circuit") described the factual scenario:

> [Aguiar and his codefendants] indulged in a violent crime spree throughout the
> District of Columbia metro area that lasted for nearly a year and a half.
> Appellants, who began by cultivating and selling marijuana, evolved into a ring
> that committed armed bank robberies, using stolen vehicles to travel to the
> targeted banks and make their escapes. By the summer of 2004, the robbers had
> developed a signature style. The gang wore bullet-proof vests, masks, and gloves,
> and relied on superior fire power, preferring to use military weapons like AK-47s
> instead of handguns because they surmised the metropolitan police "wouldn't
> respond" when Appellants "robb[ed] banks with assault weapons." The gang
> made use of several stolen vehicles, strategically placed along the get-away-route,
> for each robbery. The robbers would serially abandon the vehicles, often torching
> them in an attempt to destroy any forensic evidence that might be left behind.

*United States v. Burwell*, 642 F.3d 1062, 1064-65 (D.C. Cir. 2011).  The matter proceeded to

trial in this Court, and Aguiar was tried alongside five other codefendants.  On July 15, 2005, a

jury convicted Aguiar on all nine counts upon which he was charged in the indictment.  Verdict

Form, ECF No. [473].

On May 4, 2006, this Court sentenced Aguiar to a term of 292 months on Count I, 60

months on Count II, 300 months each on Counts III and X, and 120 months each on Counts V,

XIII and XX, to run concurrently to each other.  The Court also sentenced Aguiar to 120 months

on Count IV and 300 months on Count XI to run consecutively to each other and to Counts I, II,

III, V, X, XIII, and XX.  Judgment in a Criminal Case, ECF No. [619].  Aguiar filed a timely

appeal of his conviction and on April 29, 2011, the D.C. Circuit affirmed Aguiar's conviction in

a published opinion.  *United States v. Burwell*, 642 F.3d 1062 (D.C. Cir. 2011), *aff'd in part en

banc*, 690 F.3d 500 (D.C. Cir. 2012).  Aguiar filed a petition for writ of certiorari with the

---

[2] A seventh codefendant later was added by virtue of a superseding indictment.
Superseding Indictment (Aug. 5, 2004), ECF No. [19].

Supreme Court of the United States which was denied.  *Aguiar v. United States*, -- U.S. --, 132 S. Ct. 357 (2011).  Aguiar currently is serving his sentence.

Pending before the Court is Aguiar's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  Aguiar's motion is premised on ineffective assistance of counsel claims related to his trial counsel, Tony L. Booker, and appellate counsel, Mary E. Davis. Specifically, Aguiar claims that his counsel rendered him ineffective assistance by: (1) failing to explain the sentencing consequences of rejecting a plea offer and proceeding to trial; (2) failing to investigate and object to Aguiar's family members being excluded from the courtroom during jury selection, and failing to object to certain portions of voir dire taking place in the jury room; (3) failing to challenge an alleged constructive amendment to the indictment; (4) failing to raise a duplicity challenge to Counts IV and XI; and (5) failing to challenge the jury instruction and verdict form related to Counts IV and XI.

## II.  LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in custody under sentence of a federal court may move the sentencing court to vacate, set aside, or correct its sentence if the prisoner believes that the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  The circumstances under which such a motion will be granted, however, are limited in light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal.  "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *United*

*States v. Frady*, 456 U.S. 152, 166 (1982).  Nonetheless, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255(b).

A prisoner may not raise a claim as part of a collateral attack if that claim could have been raised on direct appeal, unless he can demonstrate either: (1) "cause" for his failure to do so and "prejudice" as a result of the alleged violation, or (2) "actual innocence" of the crime of which he was convicted.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  However, "[w]here a petitioner raises claims of ineffective assistance of counsel in a § 2255 motion, he need not show 'cause and prejudice' for not having raised such claims on direct appeal, as these claims may properly be raised for the first time in a § 2255 motion."  *United States v. Cook*, 130 F. Supp. 2d 43, 45 (D.D.C. 2000), *aff'd*, 22 F. App'x 3 (D.C. Cir. 2001) (citation omitted).

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice."  *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted).   "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  It is the petitioner's burden to show that counsel's errors were "so serious" that counsel could not be said to be functioning as the counsel guaranteed by the Sixth Amendment.  *Harrington v. Richter*, 562 U.S. 86, 104 (2011).  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . [I]nquiry into

5

counsel's conversations with the defendant may be critical to a proper assessment of . . . counsel's other litigation decisions." *Strickland*, 466 U.S. at 691.   In evaluating ineffective assistance of counsel claims, the Court must give consideration to "counsel's overall performance," *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.   Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## III. DISCUSSION

A district court may deny a Section 2255 motion without a hearing when "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."   28 U.S.C. § 2255(b).   "'The decision whether to hold a hearing is committed to the district court's discretion, particularly when, as here, the judge who is considering the § 2255 motion also presided over the proceeding in which the petitioner claims to have been prejudiced.'" *United States v. Orleans-Lindsey*, 572 F. Supp. 2d 144, 166 (D.D.C. 2008), *appeal dismissed*, No. 08-3089, 2009 U.S. App. LEXIS 20833 (D.C. Cir. Sept. 18, 2009) (quoting *Fears v. United States*, No. Civ. A. 06-0086 (JDB), 2006 WL 763080, at *2 (D.D.C. Mar. 24, 2006) (citations omitted)); *see also United States v. Agramonte*, 366 F. Supp. 2d 83, 85 (D.D.C. 2005), *aff'd*, 304 Fed. App'x 877 (D.C. Cir. 2008).   "The judge's own recollection of the events at issue may enable him summarily to deny a Section 2255 motion." *Agramonte*, 366 F. Supp. 2d at 85 (citing *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915

(1992)).  To warrant a hearing, the petitioner's Section 2255 motion must "raise[] 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection.'" *Pollard*, 959 F.2d at 1031 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)).

Based on a thorough review of the parties' pleadings and the entire record in the criminal proceeding, the Court finds that there is no need for an evidentiary hearing on the instant motion. As explained below, Aguiar has not proffered detailed and factual allegations outside of the record such that a hearing is required on the issues raised in his motion.  Accordingly, the Court shall render its findings based on the parties' pleadings and the record.

Aguiar filed a Motion for Leave to Exceed Page Limitation, requesting that the Court grant him leave to file a § 2255 Motion in excess of the 45-page limit prescribed by LCvR 7(e). *See also* LCrR 47(e).  Aguiar asserts that in preparation of the filing of his motion and accompanying memorandum that he expected the length to be at least 65 pages.  However, Aguiar never provided the Court with a copy of the proposed brief in excess of the page limitation.  Instead, Aguiar timely filed a 6-page § 2255 Motion, and a 33-page Memorandum of Law In Support of that Motion, as well as 6 pages of Affidavits supporting his Motion, in compliance with the page limitations for such filings.  *See* Def.'s Mot., ECF No. [779]; Def's Memo. in Support of Def.'s Mot., ECF No. [808-1]; Def.'s Mot., Ex. A (Affidavit of Carlos Aguiar), ECF No. [779-1]; Def.'s Mot., Ex. B (Affidavit of Lily Aguiar), ECF No. [779-2]; Def.'s Mot., Ex. C (Affidavit of Mariana Aguiar), ECF No. [779-3].  The Court has reviewed Aguiar's pleadings and it appears that he has fully presented his arguments in his § 2255 Motion and accompanying Memorandum as filed such that this Court can address each argument on its

7

merits.  As a result, the Court finds that it does not need additional briefing in excess of the page limitation from Aguiar.  Further, the Court notes that it also granted leave for Aguiar to file a 35-page Reply Memorandum in support of his § 2255 Motion which was in excess of the 25-page limitation for a reply set by LCvR 7(e).  The Court has determined that Aguiar's request to exceed the page limitation is moot.  He has briefed his arguments in his timely filed § 2255 motion and reply brief that exceeded the page limitations, and he never provided the Court with a proposed § 2255 motion in excess of the page limitation for the Court to consider.  Accordingly, the Court shall deny as moot Aguiar's Motion for Leave to Exceed Page Limitation in Filing his Petition Pursuant to 28 U.S.C. § 2255 for the reasons described.

Turning to the merits of Aguiar's motion, Aguiar raises five ineffective assistance of counsel claims related to counsel allegedly: (1) failing to explain the sentencing consequences of rejecting a plea offer and proceeding to trial; (2) failing to investigate and object to Aguiar's family members being excluded from the courtroom during jury selection, and failing to object to certain portions of voir dire taking place in the jury room; (3) failing to challenge an alleged constructive amendment to the indictment; (4) failing to raise a duplicity challenge to Counts IV and XI; and (5) failing to challenge the jury instruction and verdict form related to Counts IV and XI.  The Court shall address each claim in turn.

### A.  *Plea Offer*

Aguiar alleges that his trial counsel failed to properly explain to him the sentence that he was facing if convicted when he was offered a plea agreement.  Aguiar submitted an affidavit that was filed alongside the pending motion attesting to the following facts:

My attorney, Mr. Booker informed me verbally that the government had offered

me a thirty (30) year plea to resolve my case.  He failed to inform and explain to me the consequences of the consecutive sentences exposure [sic] I was actually facing, if I was convicted at trial. He failed to advise me regarding the disirability [sic] of accepting the plea offered, rather than to proceed to trial. Had I been awared [sic] that I was actually facing a total of 35-years for the two (2) § 924(c) counts, consecutively with an additional 30-years for the remaining counts, I would had accepted the 30-year plea offer and pleaded guilty in a timely manner instead of proceeding to trial.

Def.'s Mot., Ex. A (Affidavit of Carlos Aguiar), at 1, ECF No. [779-1].  The Court finds that Aguiar's ineffective assistance of counsel claim fails because Aguiar was not charged with any violations of 18 U.S.C. § 924(c), using and carrying a firearm during and in relation to a crime of violence, at the time that the plea offer was extended to and rejected by him.

A criminal defendant's right to effective assistance of counsel under the Sixth Amendment extends to the plea-bargaining process.  *Lafler v. Cooper*, -- U.S. --, --, 132 S. Ct. 1376, 1384 (2012).   The Court employs the two-part *Strickland* test in analyzing an ineffective assistance of counsel claim arising out of the plea negotiations.  *Id.*  First, a defendant must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008). This Circuit has recognized that a lawyer who makes a plainly incorrect estimate of a likely sentence due to ignorance of applicable law of which he should have been aware while advising his client on the prudence of accepting a plea offer falls below the threshold of reasonable performance within the meaning of the *Strickland* standard.  *United States v. Booze*, 293 F.3d 516, 518 (D.C. Cir. 2002).  Second, a defendant must show that the error caused him prejudice. *Hurt*, 527 F.3d at 1356.  In order to establish prejudice:

[A] defendant must show that but for the ineffective advice of counsel there is a

reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 132 S. Ct. at 1385.

The Court requested that the government provide a copy of the plea agreement that was offered to Aguiar pursuant to a letter sent to Aguiar's trial counsel, in order to assist with the resolution of this claim.[3]  Govt.'s Resp. to Order of the Court, Ex. A (Sept. 17, 2004 Letter), ECF No. [852-1].   In the letter dated September 17, 2004, the government extended a plea offer that would have required Aguiar to plead guilty to three charges: (1) conspiracy to participate in a racketeer influenced corrupt organization (18 U.S.C. § 1962(d)); (2) using a fully automatic firearm in furtherance of a federal crime of violence (18 U.S.C. § 924(c)); and (3) felon-in-possession of a firearm (18 U.S.C. § 922(g)).[4]  *Id.* at 1.  If Aguiar accepted the plea offer prior to its expiration, he was entitled to a 2-level decrease under the Sentencing Guidelines for

---

[3] After reviewing the transcript from the January 31, 2005, hearing during which the plea offers were discussed, and reviewing the parties' briefs on this issue, the Court determined that the record was devoid of certain information that would be useful to the Court in reaching its analysis of this issue.  Accordingly, the Court issued an order on December 16, 2014, directing the government to provide additional information regarding the plea that was placed on the record during the January 31, 2005, status hearing.   Order (Dec. 16, 2014), ECF No. [847].  The government submitted this plea agreement letter in response to that order.

[4] While there was mention that Aguiar's plea may have been "wired" to the pleas of two of his codefendants, Govt.'s Opp'n at 11 n.6, meaning that the government would not have accepted Aguiar's plea unless the other two codefendants also entered pleas, the government in its supplemental brief indicates that Aguiar's plea was not wired.  Govt.'s Resp. to Order of the Court at 2.  The Court shall rely on the terms of the plea agreement as expressed in the letter provided to Aguiar's counsel on September 17, 2004, as the Court deems it more complete than the terms as summarily discussed during the hearing several months after the offer was made to and rejected by Aguiar.

10

acceptance of responsibility, and the government would file a motion requesting an additional 1-level decrease if Aguiar met certain conditions.[5]  *Id.* at 4-5.  Notably, by the terms of the letter, the offer expired at the conclusion of the status hearing held on September 27, 2004.  *Id.* at 1.  The Court is unaware of any other plea offer made by the government to Aguiar.[6]

On January 31, 2005, the Court also held a hearing to discuss the pleas offers extended to Aguiar and his codefendants on the record.[7]  Specifically, the Court reviewed plea offers that

---

[5] Specifically, the government's filing of the referenced motion was contingent upon Aguiar not violating the plea agreement, admitting and continuing to admit his guilt, and providing assistance in the investigation and prosecution of the offense.  Govt.'s Resp. to Order of the Court, Ex. A (Sept. 17, 2004 Letter), at 5.

[6] While Aguiar in his filings references a 30-year plea offer, Def.'s Memo. at 6, 8; Def.'s Mot., Ex. A (Affidavit of Carlos Aguiar), at 1; Def.'s Reply at 2, the Court notes that his sentencing exposure if he had accepted the plea offer is provided by the terms of the letter, *see* Govt.'s Resp. to Order of the Court, Ex. A (Sept. 17, 2004 Letter), at 2.  As explained in the plea letter, the RICO charge carried a maximum penalty of life imprisonment, the § 924(c) charge carried a mandatory minimum term of 30 years imprisonment and a maximum prison term of life imprisonment which could not run concurrently, and the felon-in-possession of a firearm charge carried a maximum term of imprisonment of 10 years.  *Id.*  Furthermore, the parties discussed the potential sentencing exposure of the plea at the January 31, 2005, hearing, which would have required a *minimum* term of imprisonment of over 30 years.  *See* Tr. 34:2-8 (Jan. 31, 2005) (government's estimation that the term of imprisonment would have been 430 to 447 months under the plea agreement); *id.* at 36:3-6 (government's estimation that the term of imprisonment if the matter would proceed to trial would be 457 to 481 months); *id.* at 34:9-14 (government indicating that if Aguiar was considered a career offender, his term of imprisonment would range from 360 months to life).

[7] As the Court explained:

[T]he whole purpose of this [hearing] is to make sure on the record that there's been a discussion with each of the clients as to what the plea offer would mean in terms of sentencing guidelines, what the plea offer would mean if they got convicted of all of it, what the difference would be in terms of potential sentences. If you disagree with the way the government has calculated [the potential sentence], you would put that on the record.

This is so that there – if it doesn't occur, that we go to trial, somebody gets convicted and then afterwards it is raised in a 2255 that they did not get a full

already had been rejected by Aguiar and his codefendants. Tr. 10:2-4 (Jan. 31, 2005), ECF No.

[728].  The Court notes, as the government pointed out in its supplemental brief, that the terms of

the plea offer as expressed in the letter differ slightly from the terms placed on the record in

summary form during the status hearing held on January 31, 2005.  *See* Govt.'s Resp. to Order of

the Court at 1.  Specifically, government counsel did not indicate during the hearing that in

addition to the RICO charge and the one section 924(c) charge, Aguiar also would have been

required to plead guilty to one count of felon-in-possession of a firearm.  *See* Tr. 33:6—34:10

(Jan. 31, 2005).  Nonetheless, the Court discussed the plea offer with Aguiar, Aguiar's trial

counsel, and the prosecutor on the record and Aguiar indicated that he did not accept the plea

offer, even as stated on the record where the prosecutor appears to have mistakenly excluded the

requirement that Aguiar also plead to one count of felon-in-possession of a firearm.  In relevant

part, the Court inquired:

> THE COURT: Did you discuss with him the difference between a RICO conspiracy and the other conspiracy?
>
> TONY BOOKER (Defense Counsel): Yes, Your Honor.
>
> THE COURT: In terms of the 924(c) and what that involves?
>
> MR. BOOKER: Yes, Your Honor.
>
> THE COURT: Is this the discussion, Mr. Aguiar, that you had with your attorney about the plea offer, the charges and what the best calculation at this point is that

---

> discussion of the plea.
>
> So this is my best way of making sure that everybody is on the same page, that whatever the government has said everybody hears, whatever defense counsel has said and your client, so that there's no issues at a later point.

Tr. 15:6-21 (Jan. 31, 2005).

12

the attorney think it is?

     MR. AGUIAR:  Yes, Your Honor.

*Id.* at 35:9-19.  The parties then discussed the potential sentencing implications of the accepting

the plea offer as opposed to proceeding to trial.[8]   After discussing the potential sentencing

implications of the plea, the Court inquired of Aguiar:

> THE COURT: Do you have any questions either now of the court or your
> counsel?
>
> MR. AGUIAR: No, Your Honor.
>
> . . .
>
> THE COURT: All right. Do you understand what was discussed?
>
> MR. AGUIAR: Yes.
>
> THE COURT: What's your decision in terms of the plea offer whether to accept it
> or not?
>
> MR. AGUIAR: No acceptance.

*Id*. at 36:13-22.  Further, the government indicated that it did not intend to renew any of the plea

offers discussed, that no plea offers were outstanding at the time of the hearing, and that any

future plea offers would require the defendant to cooperate with the government and would

require a plea to at least the RICO count and one count of a violation of 924(c).[9]  *Id.* at 10:2-19,

---

[8] During the hearing, the prosecutor did indicate that one difference between accepting
the plea offer and proceeding to trial was that under the plea offer, there would only be one
conviction of violating § 924(c) which was not a charge in the indictment pending at the time of
the plea offer.  Tr. 35:25—36:2 (Jan. 31, 2005).  However, at the time of the hearing on January
31, 2005, the second superseding indictment had been filed and, accordingly, by that time,
Aguiar was charged with two violations of § 924(c).

[9] The government also indicated that the plea offers were made in part to obviate the need
to conduct time-intensive laboratory tests and since the results of those tests had been returned,

16:16-19.

The Court shall accept only for the purposes of its analysis that Aguiar's trial counsel did not explain the sentencing implications of two violations of § 924 to Aguiar prior to him rejecting the plea offer on September 27, 2004, because Aguiar has offered this information in a sworn affidavit and the government has not provided any evidence rebutting this claim. Nonetheless, the Court cannot conclude that Aguiar's trial counsel rendered him ineffective assistance of counsel for failing to explain the sentencing implications of convictions for two violations of § 924 at a time when Aguiar was not charged with these violations.

Aguiar claims that he would have accepted the plea offer if his trial counsel had explained the sentencing consequences of the two violations of 18 U.S.C. § 924, charges for using and carrying a firearm during and in relation to a crime of violence (Counts IV and XI), pending against him. However, the plea offer expired on September 27, 2004, and Aguiar was first charged with two violations of § 924 on November 9, 2004, by virtue of the filing of the second superseding indictment. Between September 17, and 27, 2004, when the plea offer was outstanding, the first superseding indictment was the most recently filed indictment. *See* Superseding Indictment (Aug. 5, 2004), ECF No. [19].  Pursuant to that indictment, Aguiar was charged with one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 and two counts of armed bank robbery in violation of 18 U.S.C. §§ 2133(a) & (d) and 2, and no violations of § 924(c).  *Id.*  If Aguiar had accepted the plea offer prior to September 27, 2004, the government would have filed a superseding three-count Criminal

---

the government indicated that it would not renew the plea offers as they were originally offered because at the time of the hearing, the results of the tests had been received. *Id.* at 9:22–10:4.

Information to which Aguiar would have pled guilty.  Govt.'s Resp. to Order of the Court, Ex. A (Sept. 17, 2004 Letter), at 1.  Again, the plea offer would have required Aguiar to plead guilty to three charges, one count of conspiracy to participate in a racketeer influenced corrupt organization in violation of 18 U.S.C. § 1962(d), one count of using a fully automatic firearm in furtherance of a federal crime of violence in violation of 18 U.S.C. § 924(c), and one count of felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g).  On November 9, 2004, over a month after the plea offer had been extended to Aguiar and after it had expired without Aguiar accepting it, the government filed a second superseding indictment charging Aguiar with two counts using and carrying a firearm during a crime of violence in violation of 18 U.S.C. §§ 914(c)(1)(A)(ii) & (B)(ii) and 2, as well as one count of conspiracy to participate in racketeer influenced corrupt organization in violation of 18 U.S.C. § 1962(d), one count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, two counts of armed robbery in violation of 18 U.S.C. §§ 2113(a) & (d) and 2, and two counts unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  Superseding Indictment (Nov. 9, 2004), ECF No. [115].

The Court concludes that Aguiar's counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms by failing to explain to him the sentencing implications of violations to which he was not charged at the time that the plea offer was extended and expired without acceptance.  Moreover, the Court notes that on the record during the January 31, 2005, hearing Aguiar expressly indicated to the Court that he did not accept the plea offer extended to him, that he had discussions with his trial counsel about the plea

offer, and that he did not have any questions.  Accordingly, Aguiar's ineffective assistance of counsel claim relating to his trial counsel's alleged failure to inform of the sentencing consequences of two convictions under section 924(c), first charged on November 9, 2004, prior to the expiration of the plea offer on September 27, 2004, is without merit.

Furthermore, the Court notes that the government indicated on the record during the January 31, 2005, hearing that any future plea offers would have required that the defendant cooperate with the government, and Aguiar has not asserted that he would have ever entertained the idea of cooperating with the government in exchange for a plea.  Accordingly, Aguiar has not established that he was prejudiced in any way by his counsel's failure to obtain some other future plea offer beyond the one stated in the letter and addressed by this Court in relation to the instant motion.  For the reasons discussed, the Court finds that Aguiar has not established that his trial counsel rendered him ineffective assistance by failing to advise him of the sentencing implications of being convicted of two violations of § 924(c) prior to his rejection of the plea offer extended to him by the government, but before he was actually charged with two violations of § 924(c).

### B.  *Alleged Courtroom Closure during Jury Selection*

Aguiar next alleges that his trial counsel rendered ineffective assistance of counsel by failing to object to the exclusion of his mother and sister by an unnamed security officer from the courtroom during the first day of jury selection, and for failing to object to certain portions of voir dire being held on the record in the jury room.  The Court shall address each argument in turn.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

16

enjoy the right to a speedy and public trial . . . ."  U.S. Const. amend. VI.  The right to a public

trial extends to voir dire of potential jurors.  *Presley v. Georgia*, 558 U.S. 209, 213 (2010);

*Waller v. Georgia*, 467 U.S. 39, 45 (1984) (citing *Press-Enterprise Co. v. Superior Court of*

*California*, 464 U.S. 501 (1984)).  The Supreme Court of the United States in *Waller v. Georgia*,

467 U.S. 39 (1984), recognized that the right to a public trial: (1) "ensure[s] that judge and

prosecutor carry out their duties responsibly"; (2) "encourages witnesses to come forward"; and

(3) "discourages perjury."  *Id.* at 46; *see also United States v. Perry*, 479 F.3d 885, 889 (D.C.

Cir. 2007).  In order to close a criminal proceeding, "the party seeking to close the hearing must

advance an overriding interest that is likely to be prejudiced, the closure must be no broader than

necessary to protect that interest, the trial court must consider reasonable alternatives to closing

the proceeding, and it must make findings adequate to support the closure."  *Waller*, 467 U.S. at

48.

　　Nevertheless, the D.C. Circuit has recognized that some courtroom closures may be too

trivial to amount to a Sixth Amendment violation.  *United States v. Perry*, 479 F.3d 885, 890

(D.C. Cir. 2007).  Adopting the triviality standard advanced by the Second Circuit, the D.C.

Circuit explained:

> A triviality standard, properly understood, does not dismiss a defendant's claim
> on the grounds that the defendant was guilty anyway or that he did not suffer
> 'prejudice' or 'specific injury.' It is, in other words, very different from a
> harmless error inquiry. It looks, rather, to whether the actions of the court and the
> effect that they had on the conduct of the trial deprived the defendant—whether
> otherwise innocent or guilty—of the protections conferred by the Sixth
> Amendment.

*Id.* (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996)).  The D.C. Circuit then

explained, "[a] courtroom closing is 'trivial' if it does not implicate the 'values served by the

Sixth Amendment' as set forth in *Waller*." *Id.* Indeed, "'[e]ven the exclusion of a family member or friend may, in rare circumstances . . ., not implicate the Sixth Amendment public trial guarantee.'" *Id.* (quoting *Carson v. Fischer*, 421 F.3d 83, 94 (2d Cir. 2005)).

Both of Aguiar's claims related to his Sixth Amendment right to a public trial relate to incidents that allegedly occurred during jury selection. Accordingly, the Court has deemed it prudent to provide a brief summary of the factual background surrounding jury selection in the instant action. On Tuesday, April 5, 2005, the Court began jury selection in this matter. Jury selection was held in the ceremonial courtroom, courtroom 20, because that was the largest courtroom in the courthouse with a seating capacity of approximately 230.[10] While the Court has been unable to determine the exact number of potential jurors who were brought in for jury selection, the Court recalls that it was a large group given the publicity surrounding the case and the estimated length of the trial, which was 14 weeks. Tr. 56:7-10 (Apr. 5, 2005). The Court's estimate at the time of jury selection was that the trial would conclude around July 21, 2005, *id.* at 56:9, which was fairly close to the date that the jury actually returned its verdict, July 15, 2005.

On the morning of April 5, 2005, the entire jury pool was brought into the ceremonial courtroom and the Court proceeded to read the 40-question voir dire to the jury pool. From a review of the transcript, it appears that this lasted the majority of the morning. *See* Tr. 65:10-13 (Apr. 5, 2005) (indicating at the conclusion of the reading of the questions that the Court hoped to get one or two individual inquiries done prior to breaking for lunch). After the recitation of

---

[10] This estimate of the seating capacity includes the bench seating as well as the seating in the jury box as it is the Court's recollection that both were filled during jury selection in this matter.

the voir dire questions, the Court broke the jury pool down into smaller groups and asked each group to return at staggered times so the Court and the parties could conduct individual discussions with the potential jurors about their responses to the questions. *See id.* at 59:21—61:13 (dividing the pool of jurors into groups and advising each group when to return). The Court then proceeded to individual voir dire which was conducted on the record with the defendants, their counsel, prosecutors, and the Court present in the jury room. It is unclear from the record when the decision to hold the individual voir dire in the jury room was made. At the last hearing prior to trial on March 23, 2005, the Court indicated: "I'm just trying to find a space big enough so with the cast of thousands we've got for the individual voir dire, we can do it efficiently but in a place that everybody's comfortable." Tr. 419:19-22 (Mar. 23, 2005). Nonetheless, while the individual voir dire was held in the jury room, peremptory challenges of jurors were conducted in the open courtroom. There are no objections on the record by any counsel to this process of jury selection.

Jury selection in this matter spanned from Tuesday, April 5, 2005, through the following Wednesday, April 12, 2005. After the Court read the questions to the jury, it immediately proceeded to the individual inquiries of each juror which started late in the morning of Tuesday, April 5, 2005, and continued until the afternoon of Monday, April 11, 2005, when 52 potential jurors had been identified. *See* Tr: 65:14-16 (Apr. 5, 2005); Tr. 983:20-24 (Apr. 11, 2005). On the afternoon on April 11, 2005 through April 12, 2005, the parties made peremptory challenges to the prospective jurors in courtroom 10.[11] Opening arguments and the presentation of evidence

---

[11] The peremptory challenges and the trial proceeded in courtroom 10, a courtroom with less seating than the ceremonial courtroom, but equipped with bulletproof glass separating the

commenced on Monday, April 18, 2005.

Turning first to the allegation that Aguiar's mother and sister were not permitted to enter the courtroom at 9:30 a.m. on the first day of jury selection, the Court finds that this action did not violate the Sixth Amendment under the triviality standard for the reasons described herein. Aguiar submitted affidavits from his mother, Lily Aguiar, and his sister, Mariana Aguiar.  Def.'s Mot., Ex. B (Affidavit of Lily Aguiar), ECF No. [779-2]; Def.'s Mot., Ex. C (Affidavit of Mariana Aguiar), ECF No. [779-3].  Both affidavits indicate:

> On April 5, 2005 [Lily Aguiar and Mariana Aguiar] arrived at the courthouse around 9:30 A.M. on the date that Carlos' trial was to start.
>
> Upon arriving to the courtroom, [Lily Aguiar and Mariana Aguiar] were prevented from entering the courtroom by an unidentified court officer who informed us that we could not enter the courtroom because the jury selection had started, and that nobody was being allowed to enter until the jury selection was finished.
>
> [Lily Aguiar and Mariana Aguiar] left the courtroom area as advised by the unidentified court officer. We were under the inpression [sic] that nobody was allowed to enter the courtroom during the jury selection.
>
> About three days later, [Lily Aguiar and Mariana Aguiar] returned to see if the jury selection was finished. We were finally allowed to enter the courtroom with no problem.

Def.'s Mot, Ex. B ¶¶ 3-6; Def.'s Mot., Ex. C ¶¶ 3-6 (numbering omitted).  Aguiar also submitted an affidavit indicating:

> During one of our recess breaks of the jury selection, I asked Mr. Booker to check and to see if my mother and sister were waiting outside the courtroom. Mr. Booker never inform me as to whether he did or did not check for me, if my mother or sister were outside of the courtroom . . . .

---

audience from counsel tables, the jury box, the well of the courtroom, the witness stand, and the bench which was deemed necessary given some security concerns related to this matter.

> During trial I notified Mr. Booker and explained to him what had occurred
> on the first day of trial, I asked him to investigate, and to speak to the
> judge about what had occurred with my mother and sister, and to verify
> the reasons for such actions taken by a court officer.

Def.'s Mot, Ex. A ¶¶ 3 & 5 (Affidavit of Carlos Aguiar).    Based on these sworn statements,

Aguiar contends that his Sixth Amendment right to a public trial was violated when his mother

and sister were not permitted to enter the courtroom during jury selection at 9:30 a.m. on April 5,

2005.

Aguiar offers two alternative objections because the record is unclear as to who

authorized the closing of the courtroom.  Indeed, neither party contends that there was ever a

written order entered on the docket, or an oral order given during a hearing from the Court

authorizing the closing of the courtroom.  In light of the absence of an order, Aguiar asserts that

either the Court failed to properly provide findings in order to close the courtroom, Def.'s Memo.

at 17-20, or the unnamed security office, without authority from the Court, barred his mother and

sister from attending, Def.'s Memo. at 21-23.  The Court shall accept the statements in the sworn

affidavits as true for the purposes of this analysis because they were not rebutted in any way by

the government and because the Court has determined that a further hearing in this matter is

unnecessary.

Based on the record and this Court's own independent recollection of the events at issue,

the Court avers that it never ordered that the courtroom be closed during any portion of jury

selection or, for that matter, during any phase of trial.  Nor did the Court, without issuing an

order, instruct the United States Marshal Service or any Courtroom Security Officer to exclude

any member of the public from jury selection or the trial.  Accordingly, the Court concludes for

the purposes of this analysis that Aguiar's mother and sister were not permitted into the courtroom by a security officer who was not acting under the authority of the Court.[12]

A courtroom closure that is not authorized by a judge still may raise Sixth Amendment concerns.[13]  *See, e.g., Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007) ("[E]ven if the courtroom was closed because of inattention by the judge, courts have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access."); *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004) ("Whether the closure was intentional or inadvertent is constitutionally irrelevant.").  Nonetheless, some courtroom closures are too trivial to amount to a Sixth Amendment violation.  *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007).  In order for the Court to determine whether the courtroom closure meets the triviality standard, it must consider whether the closure implicates the values served by the Sixth Amendment as set forth by the Supreme Court in *Waller*.  *Id.*  "The Supreme Court has described the values furthered by the public trial guarantee as four: 1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury."  *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996).

The Court finds that based on these four factors, the closure alleged by Aguiar was so

---

[12] The Court was informed by the United States Marshal Service that there are not records indicating who was assigned to the courtroom on April 5, 2005.

[13] At least one Circuit Court has recognized that "[t]he denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom."  *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994) (holding that a judge not taking steps to ensure that members of the public were permitted into the courthouse after 4:30 p.m. when the courthouse closed but the trial was still proceeding did not violate the Sixth Amendment).  In the instant action, the Court took no affirmative step to close the courtroom.

trivial that it did not violate the Sixth Amendment and, because there was no Sixth Amendment violation, the Court finds that Aguiar's trial and appellate counsel did not act outside of the standards of professional norms such that they rendered him ineffective assistance of counsel. Here, there is evidence that at one specific period in time, namely April 5, 2005, at 9:30 a.m., two of Aguiar's family members were not permitted to enter the courtroom by a security officer. The family members returned three days later when jury selection was ongoing and were permitted to enter without issue.  On April 5, 2005, at the specified time, the Court was simply reading the 40 voir dire questions to a pool of potential jurors from a list of questions that had been prepared in advance and provided to Aguiar's counsel and the defendants.  *See generally* Tr. 3:2—65:13 (Apr. 5, 2005).  It is the Court's recollection that all the seating in the courtroom at this time was being used by potential jurors.  However, despite its best efforts, the Court has been unable to verify this information.[14]  If space was the reason that the two family members were turned away from the courtroom at 9:30 a.m., it is clear that any space issues would have been obviated after the initial reading of the questions to the jurors on the morning of April 5, 2005, when the Court divided the pool of potential jurors into groups and instructed the different groups to come back at different times to the courtroom.[15]  *See id.* at 58:6-15.  Nonetheless, the

---

[14] The Court contacted the jury office in the courthouse to determine if there was record indicating how many jurors were brought to the courtroom so that it could compare it to the capacity of the room.  The jury office does not have that information. However, as noted, the ceremonial courtroom holds approximately 230 people.

[15] The Court distinguishes the facts of this case from *Owens v. United States*, 483 F.3d 48 (1st Cir. 2007), where the First Circuit held that the closing jury selection to the public for an entire day without meeting the *Waller* requirements would violate a defendant's right to a public trial, *id.* at 66, because in *Owens*, the marshal cleared the courtroom in order to make room for the jury pool at the Court's direction. *Id.* at 54.  Here, the Court never ordered the courtroom to be cleared.  Instead, Aguiar's claim is that his family members were not permitted to enter by an

23

presence of Aguiar's two family members in the courtroom during the reading of the voir dire questions previously provided to defense counsel and the defendants does not invoke the values promoted by the Sixth Amendment's guarantee of a public trial.  Indeed, Aguiar's two family members' presence in the courtroom while voir dire questions were read to the jurors would not have affected the fairness of the trial, reminded the prosecutor and judge of their responsibility to the accused and the importance of their functions, encouraged witnesses to come forward, or discouraged perjury.  Rather, the vast majority of what was discussed in court at that time was a mere recitation of information that had already been provided to the parties, and was placed on the record.  Accordingly, the Court concludes that Aguiar's ineffective assistance of counsel claim both at the trial and appellate level with regard to the alleged courtroom closure on April 5, 2005, at 9:30 a.m. fails because the closure in question was too trivial to amount to a Sixth Amendment violation.

Turning next to Aguiar's argument that his counsel failed to object to holding certain portions of jury selection in the jury room, the Court finds that this claim fails because this closure also was trivial.  After the Court recited the questions to the jury pool, it conducted the individual discussions with the potential jurors about their responses to the questions in the jury room on the record with the presence of the defendants, their counsel, the prosecutors, and

---

unidentified security officer.  Further, in *Owens*, the First Circuit indicated that the trial court should have considered whether there was a larger courtroom available that could have accommodated both the potential jury pool and members of the public and should have permitted members of the public to reenter as jurors were dismissed.  *Id.* at 62.  Here, as previously mentioned, the proceedings at the objected to time were held in the ceremonial courtroom which is the largest courtroom in the courthouse.  Further, there is no evidence on the record that members of the public were not permitted to enter after the reading of the questions when the members of jury pool were broken down into smaller groups and asked to return at staggered times.

Deputy U.S. Marshals, rather than at side bar in the courtroom.[16]   The Court permitted the individual questioning to take place in the jury room in order to accommodate Aguiar, his five codefendants, their six attorneys, and the two government attorneys, one of whom was in a wheelchair, who needed to be present during the discussion.   This also allowed Aguiar and his codefendants to observe directly and close at hand the demeanor of the prospective jurors and hear their answers.   During this time, the courtroom remained open to the public and members of the jury were seated in the courtroom and brought back one at a time to the jury room, after which they either returned to the courtroom or were excused.   The peremptory challenges of counsel were conducted in the open courtroom.

The Court turns to the issue of whether conducting the individual inquiry in the presence of the codefendants, their counsel, and government counsel on the record in the jury room was too trivial to warrant a Sixth Amendment violation such that Aguiar's counsel was ineffective for failing to object to it.   The Court has determined that the closure was trivial for the reasons described herein.   First, the Court finds that the Sixth Amendment values of encouraging witnesses to come forward and discouraging perjury do not weigh either for or against a finding of triviality because there was no testimony presented during the time at issue.   Further, the Court finds that the Sixth Amendment values of ensuring a fair trial and reminding the prosecutor and judge of their responsibility to the accused do not require a finding that the

---

[16] Prior to the Supreme Court's ruling in *Presley v. Georgia*, 558 U.S. 209, 213 (2010), it was common practice in the courthouse to conduct the individual voir dire of jurors in the jury room when a case involved multiple codefendants and there was a large jury pool because it was less time consuming.   Indeed, as is the practice now, two courtrooms and additional staff members are needed to escort jurors from their seats in one courtroom into a different courtroom in order to conduct the individual questioning on the record in open court.

closure at issue was more than trivial based on the facts in this case.  Indeed, the proceedings were held on the record such that they could be reviewed and challenged if there were improprieties.  Nonetheless, while members of the public were not permitted in the jury room during the individual voir dire, what transpired in the jury room would have been conducted in part at side bar if it had occurred in the courtroom.  Accordingly, the Court concludes that the Sixth Amendment violation was too trivial to warrant relief when the Court conducted the individual questioning of potential jurors in the presence of the parties and on the record in the jury room.  *See United States v. Patton*, 502 Fed. App'x 139, 142 n.3 (3d Cir. 2012) (finding the Sixth Amendment was not violated when individual voir dire occurred in the closed jury room adjacent to the courtroom); *United States v. Santos*, 501 F. App'x 630, 633   (9th Cir. 2012) (finding that a courtroom closure during voir dire due to the size of the courtroom and jury pool was trivial); *United States v. Bansal*, 663 F.3d 634, 661 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2700 (2012) (finding the questioning of potential jurors in a closed jury room adjacent to the courtroom did not violate the Sixth Amendment guarantee to a public trial when there was no objection by trial counsel and the proceedings were on the record); *Gibbons v. Savage*, 555 F.3d 112, 121 (2d Cir. 2009), *cert. denied*, 558 U.S. 932 (2009) (finding the closing of the courtroom during voir dire was too trivial to vacate a conviction and noting that a significant portion of the afternoon session was private interviews with individual jurors held in an adjacent room out of the hearing and sight of other jurors); *But see, e.g., United States v. Withers*, 638 F.3d 1055, 1063-64 (9th Cir. 2010) (holding that a closure of the courtroom during voir dire only violated the Sixth Amendment if the courtroom closure lasted for more than a trivial duration and the

district court did not comply with the *Press-Enterprise/Waller* requirements).[17]

For the reasons described, the Court finds that Aguiar's § 2255 motion is denied as to the ineffective assistance of trial and appellate counsel claims related to the alleged Sixth Amendment violations because the Court concludes that the closures at issue were too trivial to amount to Sixth Amendment violations.[18]

## C. *Constructive Amendment Challenge to the Indictment*

Aguiar next argues that his trial counsel failed to object to the constructive amendment to the indictment through the introduction of evidence presented at trial as well as the instruction and verdict form given to the jury. Specifically, Aguiar alleges that "[c]ounsel failed to

---

[17] The facts of *Withers* are distinguishable from this case. In *Withers*, the district court ordered all the members of the public present in the courtroom to leave before the jury panel was brought in to the courtroom and voir dire was conducted. *United States v. Withers*, 638 F.3d 1055, 1064 (9th Cir. 2010). The Ninth Circuit remanded the case to the district court to further develop the factual record to determine whether the closure lasted longer than a trivial duration and whether the district court complied with the requirements for ordering that the courtroom be closed. *Id.* Here, as discussed, the Court never ordered that the courtroom be closed and only held a portion of the voir dire in the jury room.

[18] The Court further notes that Aguiar has not alleged that he was prejudiced in any way by his counsel's failure to object to either of these courtroom closure incidents cited. While there is some uncertainty as to whether a defendant raising an ineffective assistance of counsel claim related to alleged courtroom closure in violation of the Sixth Amendment must separately show prejudice in order to sustain a claim, the Court notes that if that is a requirement, Aguiar has failed to make such a showing. *See, e.g., United States v. Gomez*, 705 F.3d 68, 80 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 61 (2013) (finding that the defendant failed to satisfy the prejudice prong of the *Strickland* analysis when he claimed his counsel was ineffective for failing to object to his family's exclusion from the courtroom during jury selection); *Charboneau v. United States*, 702 F.3d 1132, 1138 (8th Cir. 2013) (finding that the defendant must establish prejudice on appeal because his appellate counsel's deficient performance did not result in the alleged structural error of the lack of a public trial); *Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007) (finding that prejudice is presumed under the *Strickland* analysis when there is a failure to object to a structural error such as a courtroom closure); *see also United States v. Withers*, 638 F.3d 1055, 1067-68 (9th Cir. 2011) (noting that the Ninth Circuit has strongly suggested that prejudice can be presumed where counsel's deficient performance results in a structural error).

challenge the introduction of numerous weapons that were not connected to the two bank robberies counts, he failed to challenge the jury instructions and the verdict forms during its submission to the jury." Def.'s Memo. at 28. Aguiar argues that he was convicted of two counts of violating 18 U.S.C. § 924(c) based on this constructive amendment to the indictment that his counsel failed to challenge. The Court finds that this argument is without merit for the reasons described herein.

Pursuant to 18 U.S.C. § 924(c)(1)(A), it is a crime to use or carry a firearm in relation to a crime of violence or a drug trafficking crime, or to possess a firearm in furtherance of such crimes. The statute proscribes different sentencing requirements depending on the type of firearm used. Specifically, if the firearm in question is a semiautomatic assault weapon, then the statute imposes a minimum 10-year term of imprisonment for the first violation of section 924(c), and if the firearm in question is a machinegun, then the statute requires a 30-year mandatory minimum sentence for a first violation of that provision. 18 U.S.C. § 924(c)(1)(B)(i)-(ii) (2004).[19] For a second conviction of violating section 924(c), the statute proscribes a minimum term of imprisonment of 25 years, and a life term if the firearm in question is a machinegun. 18 U.S.C. § 924(c)(1)(C).

Here, Aguiar was charged with and convicted of two counts of violating § 924(c)(1)(A), Counts IV and XI. Count IV related to the bank robbery that occurred on January 22, 2004, and Count XI related to the armed robbery that occurred on June 12, 2004. Superseding Indictment

---

[19] Unless otherwise specified, all citations in this subsection of the Memorandum Opinion refer to the 2004 version of the United States Code that was in effect at the time of that Aguiar was originally indicted, even though there have not been significant changes to the relevant portions of the statute that would affect the analysis of this issue.

(Feb. 15, 2005), at 18, 25. Specifically, it was alleged in the indictment that Aguiar "knowingly

used, brandished, carried and possessed a firearm, that is, *a machinegun*, during and in relation to

and in furtherance of a crime of violence . . . , specifically, armed bank robbery . . . ." *Id.* at 18,

25 (emphasis added). The jury convicted Aguiar under both Counts IV and XI. Verdict Form at

3, 4, ECF No. [473]. However, the jury found that it was proven the firearm in question under

both counts was a semiautomatic assault weapon, but not a machinegun. *Id.* at 3, 5.

　　Aguiar alleges that "the district court's instruction to the jury, the jury verdict and the

evidence introduce[d] by the government on the §§ 924(c) counts amounts to a constructive

amendment of the indictment," Def.'s Memo. at 23, because Aguiar was convicted of use of a

semiautomatic assault weapon, rather than a machinegun. Further, as the basis of his ineffective

assistance of counsel claim, Aguiar argues that, "[c]ounsel failed to challenge the introduction of

numerous weapons that were not connected to the two bank robberies [sic] counts, he failed to

challenge the jury instructions and the verdict forms during its submission to the jury." *Id.* at 28.

The government contends that there was no constructive amendment to the indictment and,

instead, Aguiar was simply convicted of a lesser included offense. Govt.'s Opp'n at 27.

Accordingly, the government asserts that because there was no constructive amendment to the

indictment, Aguiar has not established that his counsel was ineffective with relation to this issue.

Further, the government argues that the jury found all the requisite elements of the offenses

proven beyond a reasonable doubt and, thus, Aguiar's conviction under both counts was proper.

*Id.*

　　The Court finds Aguiar's ineffective assistance of counsel argument unavailing because

counsel could not have successfully argued that the indictment was constructively amended by

the evidence presented, the instructions given, and the jury verdict form provided for several reasons.  First, the Court concludes that Aguiar's claim fails because he was charged in the indictment with violations of section 924(c) involving either a machinegun *or* a semiautomatic weapon.  While Aguiar argues that inclusion of the word "machinegun" in the description in the indictment precludes a conviction of violating section 924(c) through use of a different type of firearm, the Court finds this argument flawed based on a reading of the indictment.  As Aguiar correctly notes, the indictment for both Counts IV and XI does reference "the firearm, that is, a machinegun."  Superseding Indictment (Feb. 15, 2005), at 18, 25.  However, under both Counts, the indictment also indicates that the charge is: "Using and Carrying a Firearm During a Crime of Violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i)(ii)(iii), *(B)(i) and B(ii)*, and 2." *Id.* (emphasis added).  The Court notes that 18 U.S.C. § 924(c)(1)(B)(i) covers an offense involving an semiautomatic assault weapon and section 924(c)(1)(B)(ii) covers an offense involving a machinegun.   18 U.S.C. § 924(c)(1)(B)(i)-(ii).   Notably, section 924(c)(1)(B)(i) *only* addresses the sentencing implications if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon. *Id.* at (B)(i).  Therefore, its inclusion in the indictment can *only* signal that the grand jury was indicting Aguiar on these charges as related to a machinegun or, in the alternative, a semiautomatic assault weapon.   Indeed, the inclusion of this statutory provision should have put Aguiar on notice that he faced conviction under either provision of the statute. *See United States v. Hitt*, 249 F.3d 1010, 1026 (D.C. Cir. 2001) ("'[B]asic principles of fundamental fairness' underlying the two key purposes of an indictment—notice to the defendant and protection against double jeopardy.").

The more specific language of the indictment supports this reading. Both Counts IV and

XI incorporate language from Count I of the indictment that provides a more specific description of the firearms alleged to have been possessed by Aguiar.  Superseding Indictment (Feb. 15, 2005), at 18, 25.  In the indictment it is charged that on January 22, 2004, Aguiar along with two codefendants "armed themselves with assault weapons," and Aguiar acted as lookout, "while armed with a fully automatic AR-15 assault weapon." *Id.* at 7-8.  The indictment further charges that on June 21, 2004, Aguiar along with three codefendants "armed themselves with assault weapons," and Aguiar "was armed with a fully automatic AK-37 assault weapon." *Id.* at 11-12. The Court notes that the descriptions of the weapons in the indictment meet the statutory definition of a semiautomatic assault weapon that includes the Colt AR-15 (i.e. the "AR-15" described in Count IV), and all models of Poly Technologies Avtomat Kalashnikovs (i.e. the "AK-37" described in Count XI). 18 U.S.C. § 921(a)(30).  The issue of whether or not these weapons were also machineguns, i.e. "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," was submitted to the jury. 26 U.S.C. § 5845(b).  Accordingly, the Court concludes that pursuant to the plain language of the indictment, Aguiar was charged with two counts of violating section 924(c) through use of the weapons described in the indictment, which the grand jury charged were either machineguns *or* semiautomatic assault weapons.[20]

--------

[20] The parties correctly note that the Supreme Court found in *United States v. O'Brien*, 560 U.S. 218 (2010), that the machinegun provision of section 924(c)(1)(A)(ii) was an element of the offense, rather than a sentencing factor, and, must be proved to the jury beyond a reasonable doubt.  *Id.* at 224, 235.  The Court notes that the trial in this matter was held five years prior to the 2010 ruling in *O'Brien*, and at that time the issue of whether the type of firearm was an element of the offense or a sentencing factor under this version of the statute was still unsettled.  Indeed, prior to *O'Brien*, several circuits, including the D.C. Circuit, held that the machinegun provision of section 924(c) was a sentencing enhancement to be determined by the

Second, assuming *arguendo* that the indictment was read to solely charge Aguiar's use of machineguns in relation to the section 924(c) counts, the Court finds that the weapons introduced at trial, the jury instructions related to Counts IV and XI, and the verdict form did not constructively amend the indictment.  "Some divergences between indictment and proof . . . plainly have a constitutional dimension."  *United States v. Baugham*, 449 F.3d 167, 175 (D.C. Cir. 2006).  Indeed, some divergences "surely relate to an accused's Fifth Amendment right not to be tried for a felony 'unless on a presentment or indictment of a Grand Jury' and to his Sixth Amendment right 'to be informed of the nature and cause of the accusation.'"  *Id.*  Courts have recognized two types of erroneous divergences, variances and amendments.  *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C. Cir. 1969).  "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them."  *Id.*  A variance, on the other hand, "occurs

---

judge and not a separate element of the offense to be determined by the jury.  *United States v. Cassell*, 530 F.3d 1009, 1016-17 (D.C. Cir. 2008), *cert. denied*, 555 U.S. 1155 (2009); *see also United States v. Ciszkowski*, 492 F.3d 1264, 1268 (11th Cir. 2007); *United States v. Gamboa*, 439 F.3d 796, 811 (8th Cir. 2006), *cert. denied*, 549 U.S. 1042 (2006); *United States v. Avery*, 295 F.3d 1158, 1169-71 (10th Cir. 2002), *cert. denied*, 537 U.S. 1024 (2002); *United States v. Harrison*, 272 F.3d 220, 225-26 (4th Cir. 2001), *cert. denied*, 537 U.S. 839 (2002); *United States v. Sandoval*, 241 F.3d 549, 550-52 (7th Cir. 2001), *cert. denied*, 534 U.S. 1057 (2001). Nevertheless, the Court in this matter submitted the issue to the jury which can be viewed either as the Court requesting an advisory opinion from the jury as to the type of weapon for sentencing purposes, or as the Court treating the type of firearm as an element of the offense.  *See* Tr. 8043:5-18 (Jun. 21, 2005) (instructing the jury on the definitions of both a semiautomatic assault weapon and a machinegun); Tr. 8058:7-14 (Jun. 21, 2005) (indicating that the verdict form separates out a jury finding relating to both the semiautomatic assault weapon and a machinegun).  Regardless, the Court cannot conclude that trial counsel acted outside of professional norms by failing to argue that the type of firearm was an element of the offense as declared in *O'Brien* given the uncertainty among the Circuits on this issue at the time of trial. *See United States v. Tchibassa*, 646 F. Supp. 2d 144, 151 (D.D.C. 2009) ("Failure to predict a change in the law does not generally render counsel's performance deficient.").

when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Gaither*, 413 F.2d at 1071.

Aguiar contends that his trial counsel should have objected to the introduction of weapons into evidence not specifically charged in Counts IV and XI, as well as the jury instructions and the verdict form that allowed the jury to make a finding that Aguiar carried a semiautomatic assault weapon rather than a machinegun. Aguiar points to an opinion from the United States Court of Appeals for the Seventh Circuit in support of his argument that the indictment was constructively amended by virtue of the introduction of evidence and instruction related to semiautomatic assault weapons. The indictment in *United States v. Leichtnam*, 948 F.2d 370 (7th Cir. 1991), charged that the defendant "'did knowingly use and carry a firearm, to wit: a Mossberg rifle, Model 250CA with no serial number, during and in relation to . . . drug trafficking.'" *Id.* at 374 (quoting the indictment). The Seventh Circuit reversed the defendant's conviction on the firearms charge, holding that there was an impermissible constructive amendment to the indictment when the government introduced two handguns in addition to the Mossberg rifle into evidence at trial and, at the conclusion of trial, the jury was instructed that the charge required proof that the defendant intentionally used or carried *a* firearm, not specifically the Mossberg rifle. *Id.* at 374-75, 380-81.

The Court finds the instant action distinguishable from *Leichtnam* for several reasons. First, the indictment in *Leichtnam* charged the defendant with using and carrying a very specific firearm, the Mossberg rifle recovered during the execution of a search warrant. In the instant action, the indictment simply referred to a machinegun, a category of firearms defined by statute,

33

and Counts IV and XI included a description of assault weapons with no further designation. Second, unlike in *Leichtnam*, Aguiar was charged with using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) *or* aiding and abetting that offense in violation of 18 U.S.C. § 2, meaning that he could have been held culpable for aiding and abetting his codefendants in relation to firearms that they possessed during the commission of the two bank robberies.  Further, in *Leichtnam*, the two handguns introduced into evidence were not introduced as proof of any specific charge in the indictment.  In the instant action, the government introduced several weapons into evidence as part of its proof for the crimes charged against Aguiar and his five other codefendants with whom he was tried.[21]  Although the Court finds *Leichtnam* distinguishable, it shall nevertheless consider Aguiar's argument that his trial counsel rendered him ineffective assistance by failing to object to the constructive amendment to the indictment.

"To support a claim of constructive amendment, [defendant] would have needed to show that 'the evidence presented at trial *and* the instructions given to the jury so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment.'"  *United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005) (quoting *United States v. Sayan*, 968 F.2d 55, 59 (D.C. Cir. 1992)).  However, not every divergence from the terms of indictment constitutes a constructive amendment.  "Ultimately,

---

[21] To the extent that Aguiar appears to argue that his trial counsel should have objected to the introduction of any weapon other than the two weapons that formed the basis of Counts IV and XI as charged against him, the Court notes that Aguiar was tried alongside five codefendants and several weapons were introduced into trial that were used as evidence against Aguiar as well as the other codefendants.  The Court cannot conclude that Aguiar's trial counsel's performance fell below an objective standard of reasonableness because he did not object to the introduction of admissible evidence that was presented at trial against Aguiar and his codefendants.

whether an indictment has been constructively amended comes down to whether 'the deviation between the facts alleged in the indictment and the proof [underlying the conviction] undercuts the[] constitutional requirements' of the Grand Jury Clause: allowing a defendant to prepare his defense and to avoid double jeopardy." *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quoting *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)). Here, the introduction of the weapons at trial, the jury instructions, and the verdict form did not undercut Aguiar's ability to prepare for trial. Indeed, he was aware that he was charged with, and needed to prepare a defense for, two violations of section 924(c) related to bank robberies that occurred on two specified dates. Furthermore, given the specificity of the indictment, there were not double jeopardy concerns because the incidents giving rise to the section 924(c) charges were clearly laid out.

Given that Aguiar's alleged use of both a semiautomatic assault weapon and a machinegun in relation to the counts under section 924(c) were included in the indictment, the Court concludes that Aguiar has failed to demonstrate that either his trial or appellate counsel committed an error by failing to challenge the alleged constructive amendment to the indictment, nor can Aguiar demonstrate that he was prejudiced by counsels' failure to raise this claim. Accordingly, the Court concludes that Aguiar is not entitled to relief on his ineffective assistance of counsel claims because the evidence at trial, the jury instruction, and the verdict form did not constructively amend the indictment.

### D. *Duplicity Challenge to Counts IV and XI*

Aguiar next contends that he was rendered ineffective assistance of counsel because his counsel failed to object to Counts IV and XI of the indictment as duplicitous. Specifically,

35

Aguiar argues that "[t]he record demonstrate[s] that the superseding indictment alleging the §§ 924(c) counts—4 and 11 were duplicity because it charged two distinct offenses under the statute. The first is for use and carry; and the second is for possession."  Def.'s Memo. at 29. Aguiar asserts that his trial counsel should have objected to Counts IV and XI of the indictment, to the jury instructions, and to the verdict form.  *Id.*

The Court finds that Aguiar's ineffective assistance of counsel claim fails because his trial counsel did challenge Counts IV and XI of the indictment as duplicitous.  "Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Hubbell*, 177 F.3d 11, 14 (D.C. Cir. 1999).  "The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997), *cert. denied*, 524 U.S. 940 (1998).  "A general verdict of guilty will not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all."  *United States v. Correa-Ventura*, 6 F.3d 1070, 1081 (5th Cir. 1993) (quoting 1 Charles A. Wright, Federal Practice and Procedure: Criminal 2D § 142 at 475 (1982)).

Here, counsel for Aguiar's codefendant filed on February 1, 2005, a Joint Defense Motion to Dismiss the Indictment due to Multiplicitous and Duplicitous Charging, which was considered on behalf of all the codefendants.  Sealed Jt. Def. Mot. to Dismiss Indictment, ECF No. [172].  In that motion, Aguiar and his codefendants challenged the duplicity of Counts IV and XI of the indictment.[22]  *Id.* at 6.  The Court addressed the issue of "whether the different

---

[22] The Court notes that the codefendants in their motion and the Court in its Memorandum Opinion addressing that motion adopted the numbering scheme for the counts

alternatives under 18 U.S.C. § 924(c) -- e.g., use or carry, possess in furtherance of, brandish, or discharge a firearm -- are separate offenses, as the different alternatives carry different punishments." Memo. Op. (Mar. 16, 2005), at 19.  Ultimately, the Court noted that there may be a duplicity issue with both Counts IV and XI because the relevant provisions of the charged offenses criminalize two separate offenses: (1) using or carrying a firearm during and in relation to an applicable crime of violence, and (2) possessing a firearm in furtherance of an applicable crime of violence.  *Id.* at 20.  However, the Court found that the Government could proceed with these charges by employing use of a special verdict form to ensure that the jury considered the different alternatives separately.  *Id.*  Accordingly, this issue was raised by Aguiar's counsel through this motion and, thus, any claim for ineffective assistance of counsel on this issue does not have merit.  Nonetheless, in light of the its holding on this issue, the Court shall turn to Aguiar's claim that his trial counsel rendered ineffective assistance by failing to object to the jury instructions and verdict form.

At the relevant time period, 18 U.S.C. § 924(c)(1)(A) criminalized and provided certain sentencing requirements for "any person who, *during and in relation to* any crime of violence . . . , uses or carries a firearm, or who, *in furtherance of any such crime*, possesses a firearm . . . ."

from an earlier Indictment filed on November 9, 2004.  Memo. Op. (Mar. 16, 2005), at 2 n.1.  In this Memorandum Opinion, the Court use the numbering scheme from the Indictment filed on February 15, 2005, because it was the indictment under which Aguiar and his codefendants were tried.  The Court notes that Count IV corresponds to the charge in violation of section 924(c) for the January 21, 2004, armed robbery in both indictments.  *Compare* Superseding Indictment (Nov. 9, 2004), at 18 *with* Superseding Indictment (Feb. 15, 2005), at 18.  However, the charge in violation of section 924(c) for the June 12, 2004, armed robbery was Count XI of the February 15, 2005, indictment, and Count XIII of the November 9, 2004, indictment.  *Compare* Superseding Indictment (Nov. 9, 2004), at 27 *with* Superseding Indictment (Feb. 15, 2005), at 25.

*Id.* (emphasis added).   Pursuant to the indictment, it was charged under Count IV that Aguiar "knowingly used, brandished, carried and possessed a firearm, that is, a machinegun, *during and in relation to* and *in furtherance of* a crime of violence . . . specifically, armed bank robbery as charged in Count Three of this Indictment."   Indictment (Feb. 15, 2005), at 18.   Count XI used similar language related to the armed bank robbery as charged in Count X of the indictment, except that the grand jury also charged that Aguiar discharged the firearm.   *Id*. at 25.

As previously discussed, this Court in its March 16, 2005, Memorandum Opinion, found that § 924(c) criminalized two separate offenses: (1) using or carrying a firearm *during and in relation to* an applicable crime of violence, *and* (2) possessing a firearm *in furtherance of* an applicable crime of violence.   *Id.* at 20.   The Court permitted the government to proceed despite the potential for a duplicity issue because the government proposed using a special verdict form to ensure that the jury considered the different alternatives separately which was done in this case.   *Id.*   The issue before the Court is whether Aguiar's counsel was ineffective by permitting jury instructions and a verdict form that did not adequately separate out the two offenses.   For the reasons described, the Court finds that the jury instructions and verdict form properly supported Aguiar's convictions under Counts IV and XI because Aguiar was only convicted of using or carrying a firearm during and in relation to an applicable crime of violence, and not of possessing a firearm in furtherance of an applicable crime of violence.

The Court instructed the jury regarding Counts IV and XI as follows:

So as to these counts, Counts 4, 8, 11, and 16, using and carrying a firearm *during a crime of violence*, these are the essential elements: . . . In order to sustain its burden of proof for the crime of used, brandished, carried and possessed a firearm as charged in Counts 4 and 8 of the indictment, or use, brandished, discharged, carried and possessed a firearm, as charged in Counts 11 and 16 of the indictment,

*during and in relation to a crime of violence*, the government must prove the following two essential elements beyond a reasonable doubt . . . .

Tr. 8039:12—8040:3 (Jun. 21, 2005).   Further, the Court went on to explain the essential elements, "One, the defendant and others committed the crime of armed bank robbery . . . ; and two, *during and in relation to the commission of that crime*, the defendant knowingly used, brandished, discharged, carried or possessed a firearm."   *Id.* at 8040:6-10.   The Court then went on to provide definitions for both elements.   First, the Court defined "crime of violence" as it related to the first element.   *Id.* at 8040:11-20.   Next, the Court defined and "knowingly," "uses or carries a firearm," "brandish," "discharge," and "possession."   *Id.* at 8040:21—8043:1.

After deliberations, the jury returned a verdict form finding Aguiar guilty of both Counts IV and XI.   In relevant parts, the verdict form read as follows: "**<u>Count Four:</u>** Using and carrying a firearm *during and in relation to* a crime of violence on or about January 22, 2004," Verdict Form at 3, ECF No. [473] (emphasis added), and "**<u>Count Eleven:</u>** Using and carrying a firearm *during and in relation to* a crime of violence on or about June 12, 2004," *id.* at 4 (emphasis added).   Under both of these counts, the verdict form indicated that if the jury found the defendant guilty of that respective count, then the jury must answer a series of questions relative to the firearm involved.   In response to these questions, the jury separately found under Count IV that it was proven that: (1) Aguiar used or carried a firearm or aided and abetted the use and carrying of the firearm; (2) Aguiar possessed a firearm or aided and abetted the possession of the firearm; and (3) Aguiar brandished the firearm or aided and abetted the brandishing of the firearm.   *Id.* at 3.   The jury similarly found those three items proven as related to Count XI, and also found that it was proven that Aguiar "discharged the firearm or aided and abetted the

39

discharge of the firearm" with relation to Count XI. *Id.* at 5. Accordingly, from the verdict form it is clear that the jury found beyond a reasonable doubt that Aguiar was guilty under both Count IV and XI of using or carrying a firearm during and in relation to an applicable crime of violence. Pursuant to the verdict form, there was no option for the jury to find Aguiar separately guilty of possessing a firearm in furtherance of an applicable crime of violence under either Counts IV or XI.

On May 9, 2006, this Court entered a judgment convicting Aguiar in part of Counts IV and XI. The judgment indicates that Aguiar was adjudged guilty under both Counts IV and XI of "Using and Carrying a Firearm in Relation to a Federal Crime of Violence." Judgment in a Criminal Case at 1, ECF No. [619]. The judgment entered by the Court does not indicate that Aguiar was found guilty of the separate offense of possessing a firearm in furtherance of an applicable crime of violence in violation of § 924(c).

To the extent that Aguiar is now arguing that his counsel failed to object to the jury instructions and verdict form because they omitted the "in furtherance of an applicable crime of violence" language as required for a conviction of possession, the Court finds that Aguiar cannot establish that he was prejudiced by his counsels' failure to raise this issue either at the time of trial or on appeal. *See also United States v. Lopez*, 569 Fed. App'x 109, 109 (3d Cir. 2014) (noting that the "in furtherance" element applies only if the charge is for "possessing" a firearm); *United States v. Brown*, 669 F.3d 10, 29 (1st Cir. 2012), *cert. denied*, 132 S. Ct. 2448 (2012) (affirming a conviction where the verdict form used the language "in connection with" in relation to a section 924(c), but the jury instructions properly defined "during an in relation to" a crime of violence, and "possess" a firearm "in furtherance of" a crime of violence). Indeed, the jury

returned guilty verdicts under the "using or carrying a firearm during and in relation to an applicable crime of violence" provision of the statute and the Court used the "during and in relation to" language in the jury instructions, in the verdict form, and in its judgment. Accordingly, it is clear that even if counsel had objected to the failure to use the "in furtherance of" language related to the possession charge, Aguiar still would have been convicted of both section 924(c) violations on the grounds that he used or carried a firearm during and in relation to an applicable crime of violence.  For this reason, the Court finds that Aguiar's ineffective assistance of counsel claim related to the alleged duplicity of Counts IV and XI is without merit. Further, the Court concludes that Aguiar's appellate counsel was not ineffective for failing to raise this challenge on appeal because Aguiar has not shown that there is a reasonable probability that he would have succeeded on this argument if it had been raised on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."); *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (applying the *Strickland* standard to both trial and appellate counsel).

### E.  *Arguments of Codefendants*

Finally, Aguiar seeks to incorporate into his motion the issues raised by his codefendants in their pending § 2255 motions.  Def.'s Memo. at 5. Four of the five codefendants with whom Aguiar stood trial have § 2255 motions pending before the Court at this time.[23]  Aguiar indicates

---

[23] The Court denied the § 2255 motion of Lionel Stoddard, Aguiar's other codefendant with whom he stood trial, on November 24, 2014.  *U.S. v. Lionel Stoddard*, No. 04cr355-02 (CKK), Order (Nov. 24, 2014), ECF No. [838].  The Court also denied in part and held in abeyance in part codefendant Bryan Burwell's § 2255 Motion on January 15, 2015.  *U.S. v.*

that he wants to incorporate the arguments and authorities advanced by his codefendants into his motion. The Court first notes that Aguiar had access to all of the pleadings filed by his codefendants by virtue of their placement on the public docket. Further, to the extent that Aguiar or any of his codefendants has requested copies of documents or transcripts, the Court has provided them. Further, based on the certificates of service on the government's filings, the government sent copies of its oppositions to all of the § 2255 motions to each of the codefendants. These oppositions would certainly alert Aguiar to the issues being raised by his codefendants in their respective § 2255 motions. Finally, the Court has allowed Aguiar's codefendants to supplement their § 2255 motions after they have been fully briefed but before the Court has issued its ruling; Aguiar has made no such request.

Despite having information about his codefendant's arguments available to him, Aguiar has not indicated in any way which arguments made by his codefendants are specifically applicable to him. Indeed, each codefendant was represented by different counsel and each codefendant was charged with a different combination of offenses. Accordingly, each claim for ineffective assistance of counsel is unique to each codefendant and his own counsel. Further, without full briefing, the Court is unable to determine whether any of the codefendants' objections to their counsels' decisions would be applicable to Aguiar because Aguiar's counsel may have employed a different strategy.

In essence, Aguiar has attempted to shift the burden of determining what claims he might have, but did not raise with the Court. The Court cannot act as Aguiar's advocate by sifting through his codefendants' arguments to determine which claims raised by the codefendants

*Bryan Burwell,* No. 04cr355-05 (CKK), Order (Jan. 15, 2015), ECF No. [853].

might have been applicable to Aguiar without the benefit of having Aguiar raise them on his own behalf and explain their relevance as related to him.   Nonetheless, the Court notes that it has already considered and denied the following ineffective assistance of counsel claims raised by Aguiar's codefendants related to issues that may be broadly applicable to all codefendants: violations of the statutory and constitutional right to speedy trial; double jeopardy and multiplicity challenges to the indictment; Confrontation Clause challenges to certain evidence; informant jury instructions; theory-of-defense jury instruction; government misconduct; jury polling; and juror misconduct. *See U.S. v. Bryan Burwell*, No. 04cr355-05 (CKK), Memo. Op. (Jan. 15, 2015), at 8-23, 28-30, 32-43.  ECF No. [854]; *U.S. v. Lionel Stoddard*, No. 04cr355-02 (CKK), Memo. Op. (Nov. 24, 2014), at 7-23, ECF No. [839].  As discussed, the Court shall not reconsider these claims on Aguiar's behalf when he has not specifically raised them. To the extent that the Court grants relief to any of Aguiar's codefendants on an issue that the Court finds to be applicable to all codefendants, the Court shall reconsider its ruling on this issue.

### F.  *Certificate of Appealability*

When the district court enters a final order resolving a petition under 28 U.S.C. § 2255 that is adverse to the petitioner, it must either issue or deny a certificate of appealability.  Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 11(a).  By statute, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Such a showing demands that Aguiar demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)

(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For the reasons set forth above, the Court concludes that Aguiar has failed to make that showing in this case, and, accordingly, no certificate of appealability shall issue from this Court.  To the extent Aguiar intends to file an appeal, he must seek a Certificate of Appealability from the United States Court of Appeals for the District of Columbia Circuit in accordance with Federal Rule of Appellate Procedure 22(b).

## IV.  CONCLUSION

For the foregoing reasons, the Court finds no reason to set aside Aguiar's conviction or sentence.  Accordingly, Aguiar's [779] Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 is DENIED.  Further, Aguiar's [780] Motion for Leave to Exceed Page Limitation in Filing his Petition Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence is DENIED AS MOOT.  To the extent Aguiar intends to file an appeal, he must seek a Certificate of Appealability from the United States Court of Appeals for the District of Columbia Circuit in accordance with Federal Rule of Appellate Procedure 22.  An appropriate Order accompanies this Memorandum Opinion.

An appropriate Order accompanies this Memorandum Opinion.

*This is a final, appealable order.*

                    _____*/s/*_____

                    **COLLEEN KOLLAR-KOTELLY**
                    UNITED STATES DISTRICT JUDGE